Joey L. DEGITZ, and Robert
Degitz Plaintiffs,

v.

SOUTHERN MANAGEMENT SERVICES, INC., d/b/a Freedom Village Nursing Center and Inn, Defendant.

No. 97–1384–CIV–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

March 10, 1998.

---

Thomas P. Flynn, Legler & Flynn, Bradenton, FL, for Plaintiffs.

Sandra Lynn Fanning, Macfarlane, Ferguson & McMullen, Tampa, FL, James Addison Martin, Jr., Macfarland Ferguson & McMullen, Clearwater, FL, Daniel H. Kunkel, Kunkel, Miller & Hament, Sarasota, FL, for Defendants.

Ronda R. Storms, Ronda R. Storms, P.A., Tampa, for Lotus H. Elliott, Helen C. Elliott, appellants.

Joryn L. Jenkins, Law Office of Joryn L. Jenkins, Tampa, for Melvin Joseph Hancock, Sr., appellees.

## *ORDER*

KOVACHEVICH, Chief Judge.

This cause comes before the Court on Defendant, Southern Management Services, Inc.'s, ("Defendant") Motion for Summary Judgment and Supporting Memorandum of Law (Docket No. 12), Defendant's Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment (Docket No. 13), Depositions of Phillip E. Harper, Jill Dengl West, Robert Pelmear, and Estrella Flores (Docket No. 17), and Plaintiffs' Reply and Memorandum in Opposition to Defendant's Motion for Summary Judgment, with exhibits (Docket No. 15).

In its motion, Defendant asserts that summary judgment is appropriate with regards to: (1) Plaintiff, Joey Degitz', hostile work environment sexual harassment claim under Title VII and Florida Civil Rights Act of 1992 (FCRA) (Count I); (2) Plaintiff, Joey Degitz', claim for battery (Count II); (3) Plaintiff, Joey Degitz', claim for negligent hiring and retention (Count III); and (4) Plaintiff, Robert Degitz', claim for loss of consortium (Count IV). Summary judgment is granted in part and denied in part.

Plaintiffs' claims derive from Plaintiff, Joey Degitz', employment with Freedom Vil-

lage Nursing Center and Inn ("Freedom Village"), as an Administrative Assistant to Mr. Kirk A. Copley ("Copley"). Plaintiff, Joey Degitz, began working for Freedom Village as a certified nursing assistant prior to accepting the position with Mr. Copley. Plaintiff, Joey Degitz, asserts that beginning in March, 1995, Mr. Copley, her supervisor, began subjecting Plaintiff to inappropriate sexual remarks and sexually explicit jokes. Plaintiff, Joey Degitz, describes specific instances where Mr. Copley made sexual advances, rude comments, and unwanted physical contact with her during business hours and at a company function.

## Standard of Review

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact, when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 995–97 (5th Cir.1979), (quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969)). Material factual disputes preclude summary judgment.

The United States Supreme Court, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), held:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* 477 U.S. at 322. Moreover, the Court stated, "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Id.* at 324.

As the district court in *Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808 (N.D.Tex.1994), summarized:

> Although a court must "review the facts drawing all inferences most favorable to the party opposing the motion,"...the nonmovant may not rest on mere allegations or denials in its pleadings; in short, "the adverse party's response...must set forth specific facts showing that there is a genuine issue for trial ." However, merely colorable evidence or evidence not significantly probative will not defeat a properly supported summary judgment...The existence of a mere scintilla of evidence will not suffice...

*Id.* at 810–11 (citations omitted). Issues of fact are "'genuine' only if a reasonable jury considering the evidence presented could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## Discussion

### A. SEXUAL HARASSMENT

#### I. FCRA

■ Defendant asserts that Plaintiff, Joey Degitz', state law claim is barred because under FCRA §§ 760.07, .10 & .11, Fla. Stat. (1995), she must first exhaust her administrative remedies prior to filing the instant suit. As a precondition to bringing an action under the FCRA, a plaintiff must: (1) file a timely complaint with the Florida Human Rights Commission ("Commission"); and (2) either obtain (i) a reasonable cause determination, or (ii) wait for the 180 day time period to expire for the Commission to make a reasonable cause determination or conciliate the matter.

Plaintiff, Joey Degitz, alleges that she filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 4, 1996, and again on March 28, 1996, and that the charge was received by the EEOC on or about April 2, 1996. Defendant argues that Plaintiff, Joey Degitz, fails to allege, and her EEOC charge does not reflect, that she ever filed a charge or complaint with the Commission. Defen-

dant argues that, although Plaintiff's March 28, 1996 charge identifies the Florida Commission to be the appropriate investigating state agency, Plaintiff filed the charge with the EEOC and did not mark the box requesting that the charge be dually filed with the state agency. Moreover, Defendant argues that Plaintiff's state law claim is barred even though the Commission actually received the charge. Defendant maintains, absent dual filing, the Commission had 180 days from its receipt of the charge to conduct its own investigation and Plaintiff did not wait the prescribed period before filing suit in August, 1997.[1]

Plaintiff asserts that she filed a complaint with the Commission in March of 1996. Plaintiff explains that no action or determination was made; therefore, the instant suit was ripe 180 days after March, 1996. Plaintiff has provided a copy of her charge of discrimination where she listed the Commission as the state agency. However, as Defendant pointed out, Plaintiff did not check the box which indicates that the charge was to be filed with both the EEOC and the state agency. Nevertheless, Plaintiff has provided a copy of a letter, dated April 3, 1996, to the Commission from Plaintiff's attorney stating that two (2) copies of the Charge of Discrimination was enclosed.

Since Plaintiffs did not file the instant suit until June 2, 1997, the Commission could have received Plaintiff, Joey Degitz', charge as late as December, 1996, and the 180 days would have still run by June 2, 1997. Moreover, Plaintiff, Joey Degitz, attests that her formal charge of discrimination was served upon the Commission by the EEOC in March, 1996, and her attorney sent two (2) copies of the charge to the Commission in April, 1996. Therefore, the Court is satisfied that Plaintiff's 180 days have lapsed from the date the Commission received her charge and the precondition that the administrative remedies be exhausted, has been satisfied.[2]

## II. Hostile Work Environment

■ In order to establish a *prima facie* case of hostile work environment sexual harassment, Plaintiff, Joey Degitz, must prove: (1) that she belongs to the protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment complained of was based on sex; and (4) that the harassment complained of affected a term, condition, or privilege of employment in that it was sufficiently severe or pervasive to alter conditions of her employment and create an abusive working environment. *See Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557 (11th Cir.1987). Defendant only disputes whether Plaintiff has satisfied the fourth element.

Defendant argues that Plaintiff asserts that she was sexually harassed by Mr. Copley for over nine months; however, she fails to establish that any term, condition, or privilege of her employment at Freedom Village was affected. Defendant points out that Plaintiff, Joey Degitz, continued her position as Administrative Aide, received pay increases, favorable evaluations, and had all of her requests for flex-time and paid personal days approved. Moreover, Defendant argues, Plaintiff never received threats to her job security. In addition, Defendant contends that Plaintiff's allegations of open and continuous harassment is discredited by the fact that no other employees noticed or witnessed such harassment.

Plaintiff argues that hostile work environment sexual harassment occurs when an employer's conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Moreover, Plaintiff argues that, in order to be actionable under Title VII, conduct giving rise to a hostile work environment does not have to consist of sexual advances or have clear sexual overtones. Conduct of a nonsexual nature that ridicules women or treats them inferior can constitute prohibited sexual

---

1. Although Defendant states that Plaintiffs filed their suit in August, 1997, the Complaint was filed on June 2, 1997.

2. The parties do not dispute any other preconditions.

harassment. *See Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052, 1073 (M.D.Ala.1990). Moreover, Plaintiff argues, Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

Significantly, Defendant has not cited a case which holds that if the Plaintiff continues to receive favorable evaluations and rewards at work, that there cannot be a cause of action for sexual harassment. To the contrary, the Supreme Court has acknowledged that, "sexual misconduct constitutes prohibited 'sexual harassment,' whether or not it is directly linked to the grant or denial of an economic quid pro quo, where such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The determining factor will be whether Plaintiff can establish that Mr. Copley's conduct was severe and pervasive enough to create a hostile or abusive environment, not whether Plaintiff received raises and time off from work when requested. *See Harris* at 21–22.

Plaintiff alleges that when the administrative assistant position first became available, Plaintiff was told by other employees that Mr. Copley was encouraging her to apply for the job. Upon accepting the new position, Plaintiff asserts that she immediately became subjected to repeated, continuous, and unwelcomed sexual advances and comments made by Mr. Copley. Plaintiff claims that Mr. Copley would ask Plaintiff to "run away with him," state that "he could not concentrate with Plaintiff around," that he "would like to see Plaintiff in a bikini," and that Plaintiff "looked good enough to eat." In addition, Plaintiff contends that Mr. Copley would say to her, "would the little girl like a lolly pop?" Plaintiff contends that many more of the same, or similar, remarks were made throughout her employment.

In addition, Plaintiff describes specific acts which she alleges were extremely oppressive to her. First, Plaintiff alleges that on or about July 31, 1995, Mr. Copley gave Plaintiff a first aid kit, in which, Mr. Copley concealed a condom. Plaintiff's twelve (12) year old daughter was playing with the kit and discovered the condom. Also, Plaintiff maintains that, in September, 1995, while leaving a company cookout, Mr. Copley followed Plaintiff to her vehicle where Mr. Copley grabbed her and tried to kiss and hug her. Furthermore, Plaintiff asserts that later that same month, Mr. Copley directed Plaintiff to meet him for lunch. Plaintiff claims that during the lunch, Mr. Copley directly and specifically asked Plaintiff to participate in a threesome sexual encounter with himself and a prostitute. Plaintiff states that she refused, but later that same day, Mr. Copley entered Plaintiff's office and placed the prostitute's business card on Plaintiff's desk.

Plaintiff also asserts that on October 20, 1995, Plaintiff stayed home from work due to illness. Plaintiff states that her husband and daughter were home sick as well. According to Plaintiff, Mr. Copley called Plaintiffs' home and Plaintiffs' daughter answered the phone. Plaintiff asserts that Mr. Copley must have thought it was Plaintiff who answered the phone because Mr. Copley stated, "this is Dr. Copley, and I make house calls to make it all better." In addition, Plaintiff alleges that on numerous occasions, Mr. Copley would stand behind Plaintiff while she was at her desk and fondle her neck and back. Moreover, Plaintiff attests that she was fearful that she would lose her job if she complained to anyone. Plaintiff asserts that as a result of Mr. Copley's constant advances, she became scared, nervous, and very depressed.

█ Clearly, a jury could find that Mr. Copley's actions created an abusive work environment and that his comments and actions unreasonably interfered with Plaintiff's work performance. In determining whether an environment is "hostile" or "abusive" the Court must consider: (1) the frequency of

the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or merely an offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *See Carter v. Barnett Bank of Manatee County*, 11 Fla. L. Weekly Fed. D. 354 (M.D.Fla.1997). Assuming *arguendo* that Plaintiff's allegations are true, Plaintiff could not sit at her desk without the risk of being fondled from behind. Moreover, if Plaintiff were to call in sick, Mr. Copley would take steps to harass Plaintiff at home. Upon attending a company function, Plaintiff was subjected to unwelcomed sexual advances and physical confrontations. Furthermore, Plaintiff asserts that the remarks and encounters were continuous, repeated, and unwanted. In addition, Plaintiff describes physical confrontations and has asserted an action for battery. Furthermore, Mr. Copley directed Plaintiff to meet him for lunch, however, rather than discuss work, Mr. Copley discussed his sexual desires which included Plaintiff and a hooker. After considering the factors listed above, the Court finds that Plaintiff has established a *prima facie* case and a jury could find that Plaintiff's work environment was abusive. Defendant's summary judgment argument with regards to this issue must fail.

### III. Agency

Defendant also contends that Plaintiff is unable to show that Defendant is liable for Mr. Copley's alleged behavior. Defendant argues that in a pure hostile environment case, a supervisor's harassing conduct is typically outside of the scope of employment. As a result, employers are not automatically liable for hostile environment sexual harassment by their supervisors or employees. *See Faragher v. City of Boca Raton*, 111 F.3d 1530, 1536 (11th Cir.1997).

Nevertheless, the Eleventh Circuit has explained that an employer can be either directly or indirectly liable for its employee's sexual harassment of another employee. Direct liability lies when the employer "knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action." *Id.* at 1535. Indirect liability will be discussed below.

#### a. Direct Liability

Plaintiff primarily relies on a direct liability theory and contends that Defendant knew about the problems she had with Mr. Copley. Plaintiff appears to be arguing both actual and constructive knowledge. Consequently, Plaintiff can prove an employer's knowledge of sexual harassment by showing that "the harassment was pervasive enough to charge the employer with constructive knowledge." *See Faragher* at 1539. Plaintiff has provided several affidavits which supports her contention.

Plaintiff asserts that Defendant was placed on notice not only in October, 1995, when Plaintiff reported Mr. Copley's conduct to Phil Harper, an administrator at Freedom Village, but also when other employees made similar complaints about Mr. Copley. The affiants all seem to assert that management should have known about the "Copley problem." Moreover, Plaintiff asserts that gossip and rumors ran rampant through Freedom Village and it was common knowledge that Mr. Copley was trying to impose his "sexual perversions" upon Plaintiff.

Pam Hudson, a former employee at Freedom Village, worked under Mr. Copley as the Director of Admissions. Ms. Hudson testified that on more than one occasion, prior to April, 1995, Mr. Copley would enter her office, take mints out the candy jar on her desk, and throw them at her "crotch" area. Ms. Hudson also asserts that Mr. Copley would intentionally look at her breasts or crotch area when speaking with her. Ms. Hudson claims that in April, 1995, she went to the office of Rick Cumberland, the Executive Director of Freedom Village, and addressed Mr. Copley's behavior. Ms. Hudson asserts that Mr. Cumberland did not take her complaints seriously and suggested that she was imagining the circumstances.

Ms. Hudson asserts that she had another run in with Mr. Copley regarding a conversation she overheard, in which, Mr. Copley was allegedly making a date with another employee. Ms. Hudson maintains that Mr. Copley confronted her about what she had

heard and subsequently, she was called into Mr. Copley's office and Mr. Cumberland was present. Ms. Hudson claims that she was confronted and forced to resign. Ms. Hudson describes Freedom Village as a "rumor mill" and that from her experience at Freedom Village "it seems impossible to me to believe that upper-level management at Freedom Village was not completely aware of the oppressive atmosphere created by Mr. Copley that was imposed upon Joey Degitz."

In addition, Ms. Tess Kora, who previously worked as a Rehabilitation Technician at Freedom Village, explains that Mr. Copley made inappropriate comments to her on occasion. In addition, Ms. Kora was aware of the condom incident between Mr. Copley and Plaintiff. Ms. Kora attests that, "[g]iven the nature of the Freedom Village workplace and the constant rumors, I find it extremely unlikely that management was not aware of Mr. Copley's abusive treatment of Joey Degitz as well as other attractive women at Freedom Village."

Mr. Chris Wilson, who was also employed at Freedom Village during and after Plaintiff received her promotion to Administrative Assistant, claims that Mr. Copley approached him regarding Plaintiff. Mr. Wilson asserts that Mr. Copley gave him the impression that he was interested in Plaintiff because of her looks. In addition, Mr. Wilson has the opinion that management at Freedom village was aware of Mr. Copley's attitude. Mr. Wilson describes a situation where he was questioning Mr. Copley and Pat Donnelly, Human Resource Director at Freedom Village, about his request for a raise being denied. Mr. Wilson claims that he stated, "I heard a rumor around here that you have to have big boobs to get a raise." Mr. Wilson maintains that Ms. Donnelly responded that it was simply a rumor; however, Mr. Wilson asserts that it was clear to him that Ms. Donnelly was personally aware of the rumors concerning Mr. Copley. Mr. Wilson asserts that it was clear to everyone in the room that he was referring to Plaintiff and her promotion to the Administrative Assistant position.

Furthermore, Ms. Brenda Darwin–Sullo, also a Freedom Village employee during the relevant time period, describes the rumors circulating the workplace immediately after Plaintiff was promoted. Ms. Darwin–Sullo claims that sometime in May, 1995, she was called into Mr. Copley's office for a meeting. Ms. Darwin–Sullo claims that Mr. Copley, Pat Donnelly, and Shirley Moseguard, director of nursing, attended the meeting. Ms. Darwin–Sullo contends that the meeting concerned the rumors in the office and she was being accused of spreading them. Ms. Darwin–Sullo claims that Mr. Cumberland called Mr. Copley during the meeting and Mr. Copley stated, "[y]es Rick, the problem is being resolved now, I have her in my office." Ms. Darwin–Sullo claims that Plaintiff's supervisors had clear knowledge of the potential problem. Ms. Darwin–Sullo also reiterated the alleged conduct Mr. Copley exhibited towards women in the office and states that, at the very least, upper-management should have known how Mr. Copley treated Plaintiff.

Certainly, Plaintiff has demonstrated that genuine issue of material facts exist with regards to the extent Defendant had knowledge of Mr. Copley's alleged behavior. A jury could find that the harassment was pervasive enough so as to constitute constructive notice. The relevant inquiry is what the employer should have known in the exercise of reasonable care. *See Hirschfeld v. New Mexico Corrections Dep't.*, 916 F.2d 572, 577 (10th Cir.1990). It appears that many of Plaintiff's co-workers were fully aware of Mr. Copley's alleged antics. Indeed, a few had spoken with upper management and were given the impression that upper management had knowledge of the "Copley problem."

In addition, Plaintiff's co-worker's prior complaints tends to show that Defendant was not taking effective remedial steps to terminate the harassment. Plaintiff asserts that on or about October 26, 1995, Plaintiff reported Mr. Copley's conduct to Phil Harper, the Administrator at Freedom Village, and requested that Mr. Harper force Mr. Copley to cease all sexual advances and similar conduct directed towards Plaintiff. Plaintiff states that a meeting was arranged with Pat Donnelly, on October 30, 1995. Plaintiff asserts that, at the meeting, she requested to be transferred to another position which

Plaintiff contends was open. Plaintiff claims that she informed Ms. Donnelly that she could not continue working under these conditions. According to Plaintiff, Ms. Donnelly explained that the position was not open and that Plaintiff needed to be more aggressive with Mr. Copley. Plaintiff maintains that Ms. Donnelly basically told her to go back and handle it.

Plaintiff asserts that later the same day, she was called into a meeting with Ms. Donnelly and Mr. Cumberland. After again pleading for a transfer, Plaintiff claims she was told to return to work and that Mr. Cumberland would look into the problem. Plaintiff alleges that from October 30, 1995, through November 13, 1995, Plaintiff continued to work under the same hostile conditions. Plaintiff claims that during this two (2) week period, she repeatedly asked Mr. Cumberland what was being done about Mr. Copley. Plaintiff claims that Mr. Cumberland responded that because of an upcoming state inspection, he had not had time to look into the matter. Conversely, Mr. Cumberland asserts that he informed Plaintiff that her complaint was being investigated by the risk management department. Mr. Cumberland also claims that Plaintiff told him that there were no other incidents. Plaintiff asserts that absolutely nothing was done from the date she first informed upper management, on October 26, 1995, until the day Plaintiff resigned, November 13, 1995. On the other hand, Defendant argues that an immediate investigation was initiated and Mr. Copley was reprimanded. This conflict in evidence accentuates the genuine issues of material fact which are in dispute.

The Court finds that there is a genuine issue of material fact as to whether Defendant took "prompt remedial action." Plain-

tiff attests that she was very emotionally distraught over her treatment at work. Plaintiff claims that she was scared, nervous, and very depressed. Plaintiff testified that she was not sleeping well and frequently cried. A jury could find that Defendant failed to take any prompt remedial action or that any action taken, was ineffective. Consequently, summary judgment is inappropriate with regards to Plaintiff's Title VII and FCRA claims.

### b. Indirect Liability

In addition, under a hostile environment theory, the employer can be held indirectly liable [3]: (1) when a harasser is acting within the scope of his employment in perpetrating the harassment; or (2) when a harasser is acting outside the scope of his employment, but is aided in accomplishing the harassment by the existence of the agency relationship. *See Faragher v. City of Boca Raton*, 111 F.3d 1530, 1536 (11th Cir.1997). Mr. Copley's alleged conduct is a prime example of an employee stepping outside of his scope of employment to further his own personal ends. *See Id.* Plaintiffs do not contest this issue.

When the harasser acts outside of the scope of employment, the employer is only liable, if the harassment is accomplished by an instrumentality of the agency or through conduct associated with the agency status. *See Faragher v. City of Boca Raton*, 111 F.3d 1530, 1536 (11th Cir.1997). For example, where the harasser used the authority delegated to him by the company to assist in the harassment, the employer would be liable. *Id; See also Sparks v. Pilot Freight Carriers*, 830 F.2d 1554, 1560 (11th Cir.1987).

---

3. The case law is not consistent concerning the designation of indirect or direct liability. In *Faragher*, the Eleventh Circuit stated that an employer can be held indirectly liable if the harassment occurs within the scope of the supervisor's employment or the agency relationship aides the supervisor's ability or opportunity to harass his subordinates. In *Sparks*, the Eleventh Circuit explained that because the acts of an employer's agents are those of the employer, an employer is directly, rather than, indirectly liable. Moreover, the *Sparks* Court explained that direct liability encompasses the supervisor's actions where the

supervisor exercises the authority actually delegated to him by the employer. In *Faragher*, the Court explained that the employer could be directly liable where it knew or should have known about the harassment. However, in *Sparks*, the Court explains that under a direct liability theory, the supervisor's acts are viewed as those of the employer; "[t]herefore, there is no reason to have a notice requirement because the supervisory employee is deemed to be the employer itself and thus notice to the supervisor that he is engaging in unwelcomed harassment is notice to the employer." *Sparks* at 1560 n. 10.

Plaintiff asserts that she can also establish indirect liability because Mr. Copley was aided in accomplishing the harassment by the existence of the employment relationship. Plaintiff argues that if the harassment is accomplished merely through conduct associated with the employment, then the standard for indirect liability outlined in *Sparks* has been met. Plaintiff points to the allegation that Mr. Copley "put the word out" that he was interested in Plaintiff and that she should apply for the job. Moreover, one of the affiants states that she believes the only reason Plaintiff received the promotion was because of her looks and because Mr. Copley was attracted to her. Plaintiff asserts that these facts are sufficient to establish indirect liability.

Nevertheless, the Eleventh Circuit Court in *Faragher*, found that there was no evidence that the alleged harassing supervisors made any employment decisions based on the alleged victim's response to their sexual overtures.[4] Plaintiff does not allege that any decisions were made on the basis of her responses to Mr. Copley's alleged requests. The Eleventh Circuit explained that, "[i]n one sense, a supervisor is always aided in accomplishing hostile environment sexual harassment by the existence of an agency relationship with his employer because his responsibilities include close proximity to and regular contact with the victim." *Faragher v. City of Boca Raton*, 111 F.3d 1530, 1538 (11th Cir.1997). However, the Court of Appeals noted that the common law does not use "aided" in such a broad sense. Plaintiff has not persuaded the Court with regards to its indirect liability argument. Nevertheless, summary judgment is inappropriate under the direct liability analysis, as detailed above.

### IV. Constructive Discharge

■ Defendant argues that Plaintiff cannot show that her working conditions were so intolerable that a reasonable person in their shoes would have felt compelled to resign. Defendant contends that a reasonable person would not have felt compelled to resign

merely two (2) weeks after her initial complaint. Moreover, Defendant argues that Plaintiff has an obligation not to assume the worst, and not to jump to conclusions too fast.

Plaintiff argues that at the meeting with Ms. Donnelly she was told to be more aggressive. Obviously, Plaintiff felt that this did not adequately address her concerns. Moreover, Plaintiff argues that even though she met with Mr. Harper, Ms. Donnelly, and Mr. Cumberland, she was informed that nothing had been done to address the problem. Plaintiff contends that a reasonable person would have found that this inaction by Defendant made continuing to work intolerable and a reasonable person would have felt compelled to resign. In addition, Plaintiff compares the case at hand to *Buckley v. Hosp. Corp. of America*, 758 F.2d 1525, 1531 (11th Cir.1985). Plaintiff argues that in *Buckley*, in order to analyze whether the plaintiff presented sufficient evidence to submit a question of constructive discharge to the jury, the court looked at the humiliation imposed on the plaintiff and the fact that plaintiff was left in a position with one of the individuals involved in the complained of activity.

In the case at hand, Plaintiff asserts that her humiliation resulted from the wide spread knowledge of Mr. Copley's actions and conduct and management's inaction. Plaintiff argues that she addressed her concerns with Mr. Harper, Ms. Donnelly, and Mr. Cumberland, but after Mr. Cumberland had reassured her that he would look into the problem, but after two (2) weeks nothing had been done, she had no other recourse than resign. Plaintiff also argues that the management's decision to ignore the problem evidences a pattern of neglect on the part of Freedom Village. Plaintiff points out that Ms. Pam Hudson attests that she complained to Mr. Cumberland about Mr. Copley's behavior in April, 1995, and Mr. Cumberland did not take her complaint seriously and passed them off as unimportant.

---

**4.** Although this statement by the Eleventh Circuit appears to relate to a quid pro quo sexual harassment argument, the court used this analysis to evaluate whether the supervisors were "aided in accomplishing the harassment by the existence of their agency relationship with the [employer]." *Faragher* at 1537.

The Court is satisfied that Plaintiff's evidence is sufficient to create a jury question as to whether a reasonable person would find the working conditions at issue so intolerable that Plaintiff was compelled to resign. There is evidence that the rumors circulating Freedom Village were so widespread that upper management questioned employees about the source of the rumors. Moreover, Plaintiff asserts that Mr. Copley's behavior continued until the day she resigned. However, there is conflicting evidence as to whether management took any steps to stop the alleged harassment. Nevertheless, a jury could find that a reasonable person in Plaintiff's shoes, who did not perceive any remedial measures being implemented, would have felt compelled to resign. Unfortunately, as it appears in Plaintiff's case, she did not approach upper management until she was already pushed to her limits. Given the seriousness of the alleged conduct in this case, a reasonable person would presumably expect immediate action. Accordingly, summary judgment is inappropriate with regards to Count I.

## B. PENDENT STATE CLAIMS

### I. Negligent Hiring/Retention

As a preliminary matter, Plaintiff concedes that there is insufficient evidence to support a claim for negligent hiring. As a result, summary judgment is granted with respect to this claim. However, the negligent retention claim must be addressed in greater detail.

In Florida, negligent retention is a viable cause of action. Negligent retention occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment. See Watson v. The City of Hialeah, 552 So.2d 1146, 1148 (Fla. 3d DCA 1989); Garcia v. Duffy, 492 So.2d 435, 439 (Fla. 2d DCA 1986). However, in order to recover damages for emotional distress caused by the negligence of another under Florida's impact rule, the emotional distress must flow from a physical injury sustained by physical impact.

See Goodstein v. Gunther Motor Co., 1996 WL 903950, at *14 (S.D.Fla. Sept.12, 1996); R.J. v. Humana of Florida, Inc., 652 So.2d 360 (Fla.1995); Landry v. Florida Power & Light Corp., 799 F.Supp. 94, 96 (S.D.Fla. 1992) aff'd, 998 F.2d 1021 (11th Cir.1993).

Plaintiff asserts that an employer is only liable to an injured plaintiff for negligent retention when the employer has a "legal duty, arising out of the relationship between the employment in question and the particular plaintiff, owed to a plaintiff who is within the zone of foreseeable risks created by employment." See Garcia at 440. Moreover, Plaintiff contends that in this jurisdiction, an employer has a duty to take prompt remedial action or immediate and appropriate corrective action when an employee is potentially subjected to sexual harassment. See Reynolds v. CSX Transp., Inc., 115 F.3d 860, 866 (11th Cir.1997); Faragher v. City of Boca Raton, 111 F.3d 1530, 1535 (11th Cir.1997); Huddleston v. Roger Dean Chevrolet, 845 F.2d 900, 904 (11th Cir.1988).

In order to be liable, the employer must first owe a duty to the Plaintiff, the breach of which must be the proximate cause of the Plaintiff's harm. See Harrison v. Tallahassee Furniture Co., 529 So.2d 790 (Fla. 1st DCA 1988). Plaintiff contends that the evidence of Mr. Copley's alleged history of sexual harassment and the Defendant's knowledge thereof, is sufficient to present the question of negligent retention to the jury.

[11] An employer is liable for the willful tort of his employee, committed against a third person, if he knew or should have known that the employee was a threat to others. Plaintiff's former co-workers have stated that they addressed Mr. Copley's behavior with upper management before Mr. Copley began harassing Plaintiff. Moreover, one affiant claims that upper management forced her to resign for addressing the problems with Mr. Copley. Ms. Hudson claims that she explained to Mr. Cumberland that Mr. Copley was treating her inappropriately, and she asserts that Mr. Cumberland dismissed her complaint as unimportant. There was also evidence that Plaintiff was not quali-

fied for the job and that it was readily apparent that Mr. Copley selected her because of her appearance.

Furthermore, Mr. Wilson claims that Mr. Copley was inquiring about Plaintiff because she was attractive and Mr. Copley was interested in having Plaintiff work for him. Moreover, Mr. Wilson made the comment to Ms. Donnelly that he heard that you needed large breasts in order to get a raise at Freedom Village. According to Mr. Wilson, Ms. Donnelly was well aware of Mr. Copley's reputation; however, Ms. Donnelly assured Mr. Wilson that his comment was untrue. Under the circumstances, a jury could find that upper management had knowledge that Mr. Copley had sexually harassed employees in the past and that it was foreseeable that Plaintiff, having been selected for the Administrative Assistant position, was going to present similar problems. In addition, assuming *arguendo* that Plaintiff's allegations are true, once upper management became aware that Mr. Copley harassed Plaintiff at home while she was sick, took her to lunch to make an indecent proposal, and tried to forcibly embrace her at a company function, it is likely that immediate termination should have been considered.

Conversely, Defendant argues that no other employee had ever complained about any sexual impropriety by Mr. Copley before Plaintiff did on October 26, 1995. In order to determine whether the employer exercised the requisite level of care, a reasonable person standard will be applied. In other words, a jury will need to determine whether, under the circumstances, the reasonably prudent man would have decided to retain Mr. Copley for the particular duties he was to perform. A reasonable jury could infer, under these circumstances, that Defendant is directly liable for Mr. Copley's conduct, on a theory of negligent retention. Therefore, Plaintiff will be able to assert this cause of action to some extent. As explained below, Plaintiff's claim is fatally flawed with respect to damages for emotional injuries.

■ Defendant argues that Plaintiff has not alleged or presented any evidence, from which a jury could infer, that Plaintiff's physical contacts with Mr. Copley satisfy Flori-

da's impact rule. Although Plaintiff alleges that Mr. Copley fondled her neck and back, and, on one occasion, he tried to forcibly embrace her and kiss her, Plaintiff has not alleged that these contacts caused any physical injury. Florida law clearly requires that emotional distress flow from a physical impact caused by physical impact. Moreover, Plaintiff did not even address this argument in her Reply. However, neither party addressed the issue of whether Plaintiff's claim for economic damages under a negligent retention theory is susceptible to summary judgment. Accordingly, summary judgment is appropriate with regards to Count III, negligent hiring and negligent retention to the extent Plaintiff seeks damages for emotional distress.

## II. Battery

■ Defendant argues that Plaintiff's cause of action for battery must also fail. Florida's common law doctrine of respondeat superior is different from the standard under Title VII of the Florida Civil Rights Act of 1992. *Sussman v. Fla. E. Coast Properties, Inc.*, 557 So.2d 74, 75–76 (Fla. 3d DCA 1990); *rev. denied,* 574 So.2d 143 (Fla.1990). Plaintiff must show that the employee's conduct was within the scope of his employment. The conduct is within the scope of employment for the purposes of determining an employer's vicarious liability to third parties injured by an employee, only if: (1) the conduct is of the kind he was employed to perform; (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed; and (3) the conduct is activated at least in part to serve the employer. *See Resley v. The Ritz–Carlton Hotel Co.*, 1997 WL 811562, at *4 (M.D.Fla. Dec.9, 1997); *Ayers v. Wal–Mart Stores, Inc.*, 941 F.Supp. 1163 (M.D.Fla.1996).

Plaintiff has failed to demonstrate that any of Mr. Copley's alleged actions were in any way intended to serve the employer. Plaintiff concedes that Mr. Copley's conduct fell outside of the scope of his employment and failed to address this issue in her Reply. When "an assault is purely personal to the servant, having no real connection with the

master's business, the doctrine of respondeat superior is inapplicable to fasten liability upon the master." *Tallahassee Furniture, Co., Inc., v. Harrison,* 583 So.2d 744, 757 (Fla. 1st DCA 1991) (quoting the Restatement (Second) of Agency § 235 (1958)). As a result, summary judgment is appropriate with regards to Count II, battery.

## C. LOSS OF CONSORTIUM

 Plaintiff, Robert Degitz, joins his wife's suit with a claim for loss of consortium. Defendant argues that Plaintiff, Robert Degitz', loss of consortium claim is derivative of his wife's Title VII and Florida Civil Rights Act (FRCA) claims and should be dismissed. Plaintiff does not dispute that federal courts have uniformly dismissed loss of consortium claims based upon Title VII claims. However, Plaintiff, Robert Degitz, argues that his loss of consortium claim is viable under the FCRA and under a claim for negligent retention. As discussed above, Plaintiff, Joey Degitz', negligent retention claim must fail with regards to emotional damages and her husband's claim for loss of consortium based on the same fails as well.

Defendant's argument that Plaintiff, Robert Degitz', loss of consortium based on his wife's FCRA claim must fail, is premised on the assertion that Plaintiff, Joey Degitz', claim under FCRA is procedurally barred. As discussed above, Defendant's assertion is wrong. Moreover, Defendant argues that Plaintiff, Joey Degitz', depression and lack of desire to exercise and engage in sexual relations are attributable to causes other than the alleged sexual harassment. Defendant raises a number of issues with regards to possible other factors, which emphasizes that this claim is inappropriate for summary judgment.

## D. MITIGATION OF DAMAGES

 Finally, Defendant contends that Plaintiff, Joey Degitz, failed to mitigate damages; therefore, she has forfeited her rights to back pay. The facts surrounding this issue are more appropriate for a jury to decide. The Court cannot determine, as a matter of law, that Plaintiff, Joey Degitz, failed to seek "substantially equivalent" em-

ployment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status. Moreover, the burden of proving a failure to mitigate damages in an employment discrimination suit is on the Defendant. Defendant has failed to provide the Court with a decision finding that summary judgment is appropriate with regards to this issue. Nevertheless, genuine issues of material facts exist which precludes summary judgment on this issue. Accordingly, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 12) is **GRANTED IN PART and DENIED IN PART**; Summary Judgment is **GRANTED** with respect to Counts II (Battery), III (Negligent Hiring/Retention) to the extent Plaintiff, Joey Degitz, seeks damages for emotional distress, and IV (Loss of Consortium) to the extent it is based on Plaintiff, Joey Degitz', Title VII claim and emotional damages under a negligent retention theory; and Defendant's motion is **DENIED** in all other respects.